# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DONALD YOUNG,                              :        Case No. 1:17-cv-12
                                           :
    Plaintiff,                         :        Judge Susan J. Dlott
                                           :
    v.                                 :        **ORDER GRANTING DEFENDANT'S**
                                           :        **MOTION FOR SUMMARY**
INEOS ABS (USA) CORPORATION,               :        **JUDGMENT**
                                           :
    Defendant.                         :


This matter is before the Court for consideration of Defendant's Motion for Summary Judgment (Doc. 33). Plaintiff opposed Defendant's Motion (Doc. 39),[1] and Defendant replied (Doc. 40). Plaintiff Donald Young alleges that INEOS terminated his employment in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112 ("ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 623 ("ADEA"), the Family Medical Leave Act, 29 U.S.C. § 2601 ("FMLA"), and Ohio Revised Code § 4112.02 (disability discrimination). (Doc. 1.) INEOS

---

[1] Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 38) fails to comport with this Court's Local Rules and Standing Order on Civil Procedures. First, Standing Order I.E.1.d requires (in underlined, capital letters), "BRIEFS AND/OR MEMORANDA IN SUPPORT OF OR IN OPPOSITION TO ANY MOTION IN THIS COURT SHALL NOT EXCEED TWENTY (20) PAGES WITHOUT FIRST OBTAINING LEAVE OF COURT." Yet, Plaintiff filed a 40-page memorandum (exclusive of exhibits) without seeking leave of Court. Second, once leave of Court is obtained, Local Rule 7.2(a)(3) requires that any memorandum exceeding twenty pages include a combined table of contents and brief summary of principal arguments and primary authorities. Yet, Plaintiff's 40-page memorandum includes no table of contents and no summary whatsoever. Third, Standing Order I.E.2.b provides, "Counsel must attach to every brief in opposition to a motion for summary judgment a document entitled 'Response to Proposed Undisputed Facts' that states, in separately numbered paragraphs corresponding to the paragraphs contained in the moving party's statement of Proposed Undisputed Facts, whether each of the facts asserted by the moving party is admitted or denied." Although Defendant properly attached the required "Proposed Undisputed Facts" document to its brief, Plaintiff attaches no such document to his memorandum in opposition and, indeed, fails to address Defendants' Proposed Undisputed Facts anywhere in the 40-page memorandum submitted. Finally, Standing Order I.E.2.b also requires that a party opposing summary judgment provide a numbered list of proposed disputed facts precluding summary judgment. Again, Plaintiff's responsive memorandum contains no such identification of material facts he alleges must be tried. For these reasons, the Court should deem the facts set forth in Defendant's Proposed Undisputed Facts admitted and strike Plaintiff's response memorandum in its entirety. However, because Plaintiff cannot withstand summary judgment even when its improper memorandum is considered, the Court will not strike the memorandum.

moved for summary judgment on all claims.  For the reasons set forth below, the Court will

**GRANT** Defendant's Motion.

## I.  BACKGROUND

### A.  Facts

Young, a United States Army veteran who served in combat in Vietnam, began working at Monsanto Corporation in Addyston, Ohio in 1967.  Plant ownership changed several times over the years, and INEOS purchased the former Monsanto plant in 2007.  Throughout the ownership changes, Young remained employed at the Addyston facility.  He was 77 years old at the time he initiated this action in 2017.

Because of Young's military service, he suffers from post-traumatic stress disorder ("PTSD").  For Young, his PTSD can manifest in traditional ways (nightmares, anxiety, depression, and panic attacks) as well as in less common ways, including irritable bowel syndrome, nausea, and gastrointestinal distress.  Despite his PTSD, Young maintained his employment uneventfully with no disciplinary record of consequence for many years.

In 2013, Young applied for a Utility Operator position in the Wastewater Treatment Plant.  The Utility Operator role required significant physicality, including twelve-hour shifts of "ascending and descending stairs, ascending and descending caged ladders, turning valve wrench handles, bending, stooping, twisting, kneeling/crouching/crawling," sometimes in extreme cold or heat, at heights, in "cramped quarters" with "confined space entry," and sometimes at a "rapid pace."  (Job Description, Doc. 30-27 at PageID 1353–54.)  In addition, the job required lifting and carrying up to 50 pounds.  (*Id.* at PageID 1354.)

Generally, when employees bid on new jobs, Human Resources contacts Dr. Jeffrey Schuler—the contracted plant physician—to determine "whether or not they have any work restrictions or if there is any reason they shouldn't be awarded this job from a medical standpoint." (Schuler Dep., Doc. 37 at PageID 1621.) When Dr. Schuler was asked whether Young had any restrictions that would keep him from performing as a Utility Operator in the Wastewater Treatment Plant, Dr. Schuler suggested that he "look at the job and see how [Young] could do with some of the tasks." (*Id.* at PageID 1622.) While Young had no medical restrictions in his file, Dr. Schuler "share[d] the concern that this may not be a good fit for [Young] from a safety standpoint" because of the extensive climbing required, the need to safely navigate icy steps around tanks and down to a river bank, and his knowledge that Young "had some issues with his feet."[2] (*Id.* at PageID 1625.) Dr. Schuler also recalled questioning "not just based on me but also from the company, is this individual safe to do this job." (*Id.* at PageID 1626.) Comments had been made "about [Young] being slow and unsteady and not able to keep up." (*Id.* at PageID 1627.)

Dr. Schuler arranged to observe Young perform some of the tasks that would be required of a Utility Operator, including walking up and down spiral steps carrying sample containers, climbing a caged ladder, and navigating the narrow steps down to the river. (*Id.* at PageID 1628–35.) In addition to Dr. Schuler, others observed Young perform these tasks, including Human Resources Manager Brian Bennett, Wastewater Treatment Department Supervisor Tom Pettinger, a current operator, and the union president. (*Id.* at PageID 1639–40.) While Young

---

[2] Young acknowledges that he suffered from a foot condition that required amputation of both "big" toes and two additional toes on his right foot. (Doc. 30 at PageID 993–94.)

was able to complete the requested tasks, it appeared to Dr. Schuler that Young struggled to maintain his balance on the metal stairs around the tanks (*Id.* at PageID 1631), "looked to become unsafe" about halfway up the caged ladder because he was not using his legs (*Id.* at PageID 1632), and he could only descend the narrow steps to the river by going "very slowly to be careful." (*Id.* at PageID 1634.) At one point, Pettinger expressed concern whether it was safe for Young to attempt to complete the sample tasks after he appeared to struggle climbing the caged ladder. (*Id.* at PageID 1641.)

After Young completed the tasks, Dr. Schuler imposed medical restrictions that Young not carry objects when climbing steps over ten feet, not climb ladders over ten feet, and others that effectively barred Young from the Utility Operator position.[3] (*Id.* at PageID 1642–47; Doc. 30-29 at PageID 1356.) Although Pettinger denies it, Young claims Pettinger discouraged him from bidding on the Utility Operator position in approximately 2010, saying, "I'd rather you wouldn't bid on that, because you're close to retirement. By the time we got you trained you'd be retired and we'd waste a lot of money getting you trained." (Doc. 30 at PageID 1260–61.) Young filed a grievance challenging the denial of his bid for the Utility Operator position, but the union did not pursue arbitration of his grievance. (*Id.* at PageID 1284.) Young filed a charge with the Equal Employment Opportunity Commission ("EEOC") challenging the denial of his bid, but the EEOC dismissed the charge. (*Id.* at PageID 1284–85.)

---

[3] Pettinger would have been Young's supervisor if he won the Utility Operator position. Young specifically acknowledges that he "has not included INEOS' refusal to award him the Utility Operator's position as a separate count in his Complaint . . . and brings INEOS' conduct to the attention of this Court both because it was the impetus for his filing [the] EEOC age and disability discrimination charges against INEOS in early 2014, and because it provides background evidence to support the existence of INEOS' age and disability bias towards him" as alleged in his Complaint. (Doc. 39 at PageID 1777, n. 2.)

4

In 2014, Donnie Stewart became Electrical Maintenance Supervisor. As Young worked as an electrician, Stewart became his direct supervisor. James Briscoe served as the Maintenance Manager supervising Stewart, and Brian Bennett served as Human Resources Manager during the relevant period. (Bennett Dep., Doc. 28 at PageID 355; Stewart Dep., Doc. 27 at PageID 106–08.)

In the summer of 2014, Young—who was on light duty with broken ribs—heard Briscoe talking to Stewart, saying, "we got to do something about" Young. (Doc. 30 at PageID 1025–26.) Specifically, Briscoe mentioned "knee problems," "he's falling all the time," "he's late a lot," and "he's got a grievance file against us we don't have a snowball chance in hell of winning." [4] (*Id.* at PageID 1026.)

At the request of his superiors, Stewart began to strictly enforce the attendance rules for his subordinates—including Young—in the fall of 2014. Pursuant to INEOS' "no-fault" attendance policy, "All absences not specifically designated as authorized are unauthorized.[5] All occurrences of unauthorized absences (including reporting late or leaving early) are counted in the administration of this policy." (INEOS ABS Hourly Employee Handbook, Doc. 28-1 at PageID 500 (footnote added).) For each unauthorized absence, "attendance points" are accumulated for a rolling 12-month period. (*Id.* at PageID 500.) A single day absence earns the employee one attendance point, and half a point is assessed for a "Partial Shift Absence" or an "Absence of more than 6 minutes but less than 1 hour." (*Id.*) Employees receive written warnings at four points, six points, and eight points, but nine points require discharge. (*Id.*)

---

[4] The grievance file refers to Young's grievance regarding the Utility Operator position. (Doc. 30 at PageID 1027.)
[5] "Authorized absences" include "absences designated as FMLA," and absences related to workplace injuries, vacation, "approved non-scheduled days," jury duty, specific family deaths, military leave, union business, and level 3 snow emergencies. (Doc. 28-1 at PageID 499.)

To avoid attendance points, an employee may use up to four vacation days per year as "emergency vacation" when something unexpected happens. However, emergency vacation may only be used in full-day increments, and the employee must ask to use emergency vacation before his shift begins. (Bennett Dep., Doc. 28 at PageID 472–73, 475.)

In addition, maintenance workers (including electricians) could avoid points by utilizing an unwritten "flex" policy. Pursuant to the "flex" policy, an employee could work up to two hours before or after his shift to make up for time missed due to doctor's appointments, children's activities, unexpected traffic problems, etc. (Stewart Dep., Doc. 27 at PageID 141.) To "flex" time, an employee must call before his shift begins, ask to flex, and arrange to stay late or come in early the same week to make up the missed time. (*Id.* at PageID 141–43; Doc. 28 at PageID 342.)

From October 13, 2014 through December 17, 2014, Young reported late to work eight times resulting in his accumulation of four points. (Doc. 30-21 at PageID 1342.) Stewart gave Young a first written warning on December 17, 2014, pursuant to the INEOS attendance policy. (*Id.*) In January 2015, Young was late four more times resulting in his accumulation of two additional points. (Doc. 30-22 at PageID 1343.) As Young had then accumulated six points, Stewart gave him a second written warning on January 27, 2015. (*Id.*) Over the next month, Young arrived late four additional times, resulting in two more points. (Doc. 30-23 at PageID 1344.) As Young had accumulated eight points, Stewart gave him a "final written" warning indicating it was the "last step prior to discharge" on February 27, 2015. (*Id.*) Although he had

"flexed" time previously, Young offers no evidence that he asked to "flex" time to cover any of these instances.[6]

On March 11, 2015, Young reported late to work causing him to accrue another half point. (Doc. 30 at PageID 1194–95; Doc. 27 at PageID 215–16.) Young called in to report that he would be late. According to Young, he wanted to flex his time instead of accruing a half point, but Stewart said, "I gotta give you points anyway because you did not tell me how long you was going to be late." (Doc. 30 at PageID 1151.) According to Stewart, Young called the guard to let them know he would be late that day. (Doc. 27 at PageID 217–18.) However, Young did not arrange to make up the time he would miss or follow the proper procedure to request flex time so Stewart "told him that even though you called in, it doesn't excuse you from being tardy by calling in late. It's a no fault attendance policy." (Stewart Dep., Doc. 27 at PageID 216; Young Dep., Doc. 30 at PageID 1194–95.)

The following day, March 12, 2015, Young became ill at work. (Doc. 30 at PageID 1201.) He suffered significant gastrointestinal difficulties so, at a coworker's urging, he reported to INEOS medical services, which is staffed by nurse Carol Lawson and Dr. Schuler. (*Id.* at PageID 1202; Doc. 28 at PageID 303, 306–07.) He told Nurse Lawson, "I don't feel so good today." (Doc. 30 at PageID 1202.) Dr. Schuler sent Young home (even though Young did not want to leave work), and his wife came to pick him up and drive him home. (*Id.* at PageID 1202–03.)

---

[6] While Young argues in his summary judgment response that he tried to avail himself of the flex-time policy "on many occasions," Young testified at his deposition that his wife usually called INEOS when he was going to arrive late and that he requested to flex his time only on March 11, 2015. (*Compare* Doc. 39 at PageID 1803 with Doc. 30 at PageID 1105–07, 1239 and Doc. 31 at PageID 1381–82.)

On Friday, March 13, 2015, Young remained home sick. Nurse Lawson called Young to ask if he planned to come to work, and he replied, "I still feel woozy from yesterday, you know, and I'd just like to stay home today." (*Id.* at PageID 1205.) Young felt better on Saturday, March 14, and on Sunday, March 15 he "felt good." (*Id.* at PageID 1207.)

At INEOS, the medical department reviews every employee absence as soon as relevant information becomes available to determine whether the absence is covered by FMLA or not. (Doc. 28 at PageID 350–51.) On Monday, March 16, 2015, Nurse Lawson emailed Bennett that Young's absence on March 13, 2015 was "not FMLA qualified." (*Id.* at PageID 415; Doc. 28-2 at PageID 510.)

Although Dr. Schuler knew Young suffered from PTSD, he "had no idea that Mr. Young's PTSD could cause gastrointestinal symptoms like the ones [he] presented with on March 12, 2015." (Doc. 32-1 at PageID 1411.) Dr. Schuler had been the INEOS contract physician from July 1988 through 2018, and Young had not previously come to see him regarding gastrointestinal symptoms. (*Id.* at PageID 1411–12.) Accordingly, Dr. Schuler determined that Young's March 13, 2015 absence had no potential FMLA implications because Young did not seek medical treatment and he was incapacitated for three days or less. (*Id.* at PageID 1412.)

After Young returned to work on Monday, March 16, 2015, he was asked to meet with Stewart, Briscoe, and union president John Bays. (Doc. 30 at PageID 1208–10.) At the meeting, Briscoe informed Young that the point he earned by missing work on Friday, March 13, 2015 put him over the limit for attendance points, and he offered Young the option to retire or be fired. (*Id.* at PageID 1210.) Briscoe encouraged Young to retire honorably and "go out in good

standing with a company and we'll have a big party for you." (*Id.*) Young became upset, accused Stewart of lying (although he could not recall at his deposition what Stewart said that was untrue), and—using particularly colorful language—declined the retirement option. (*Id.* at PageID 1210–12.)

Young does not deny that he was late or missed work on the stated dates. (Young Dep., Doc. 30 at PageID 1149.) However, he testified that his tardiness was primarily due to either his wife's illness[7] or increased PTSD-related anxiety about by his wife's illness. (*Id.* at PageID 1153–57.) Young acknowledges that Dr. Schuler did not treat Young for PTSD and only knew Young suffered from PTSD because he and Young discussed a medication Young listed during an annual physical years earlier. (*Id.* at PageID 1142–43.) Young did not tell Nurse Lawson he had PTSD (*Id.* at PageID 1146), and he did not further discuss his PTSD with Dr. Schuler because, according to Young, "You learn not to talk about PTSD." (*Id.* at PageID 1144.) The INEOS supervisors who decided to discharge Young did not know he had PTSD until after his termination. (Bennett Dep., Doc. 28 at PageID 357–58; Stewart Dep., Doc. 27 at PageID 188; Young Dep., Doc. 30 at PageID 1144.)

## B. Procedural Posture

Young alleges claims for disability discrimination under both the ADA and Ohio Revised Code § 4112.02, age discrimination in violation of the ADEA, retaliation, and FMLA

---

[7] "Before all this attendance problem come," Young's wife was hospitalized for treatment of a heart condition. (Young Dep., Doc. 30 at PageID 1154.) His fear of becoming a widower after seeing her in the hospital increased the frequency of his PTSD-related anxiety attacks. (*Id.* at PageID 1155–56.) On some of the dates on which he was late, Young had an anxiety attack if his wife was not feeling well that day, and he did not like to leave their home until he knew she had taken her medication and was feeling okay. (*Id.* at PageID 1157, 1160–63.) His wife's health improved "about the same time" as his employment was terminated. (*Id.* at PageID 1164.) When asked if he ever talked to Human Resources about getting FMLA leave to care for his wife, Young responded, "What was the point? The union had already decided – convinced me that I wasn't going to get any help from the union." (*Id.* at PageID 1172.)

interference.[8]  (Doc. 1.)  INEOS moves for summary judgment on all claims.  (Doc. 33.)

INEOS contends that: (1) Young failed to provide required notice of an FMLA-qualifying condition; (2) Young cannot establish a prima facie case of age or disability discrimination; (3) Young cannot establish a prima facie case of retaliation; (4) Young cannot demonstrate that the stated reason for his termination is a pretext for unlawful discrimination; and (4) Young improperly raised a "regarded as disabled" claim for the first time in response to INEOS' Motion for Summary Judgment.  Young opposes INEOS' Motion for Summary Judgment.

## II.    APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

---

[8] Young also alleged a violation of Ohio's age discrimination statute and termination in violation of Ohio public policy, but those claims were voluntarily dismissed by joint stipulation.  (Doc. 15 at PageID 54.)

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. ANALYSIS

### A. Family and Medical Leave Act Interference Claim (Count Four)

Young alleges that his absences on March 12 and 13, 2015 should have been covered by the FMLA, and, therefore, he should not have been assessed attendance points for those absences. (Doc. 39 at PageID 1784.) If he had not been assessed attendance points for those absences, he would not have exceeded the nine points required for employment termination.

The parties tacitly agree that PTSD is an FMLA-qualifying condition, i.e., a condition to which FMLA leave would apply. The parties further agree that a minor gastrointestinal illness lasting less than three days and requiring no medical intervention is not an FMLA-qualifying condition. INEOS contends that Young failed to provide the requisite notice that his illness was

PTSD-related (as opposed to a minor gastrointestinal illness) to obtain FMLA protection for those absences. (Doc. 33 at PageID 1426; Doc. 40 at PageID 1824.)

1. *Notice of Qualifying Reason for FMLA Protection*

"[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Festerman v. Cty. of Wayne*, 611 F. App'x 310, 315 (6th Cir. 2015) (alteration in original) (quoting *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014)); *Clark v. Cherryhill Management, Inc.*, 2019 WL 2141829, at *4 (S.D. Ohio May 16, 2019) (quoting *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998)). "The employee's burden in this regard 'is not heavy.' An employee need not expressly assert rights under the FMLA but will be deemed to have given the employer sufficient notice by providing information from which the employer can reasonably conclude that an FMLA-qualifying circumstance is in play." *Reeder v. Cty. of Wayne*, 694 F. App'x 1001, 1006 (6th Cir. 2017) (quoting *Wallace*, 764 F.3d at 586); 29 C.F.R. § 825.303(b) ("An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request . . . Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act.").

As the Sixth Circuit has reiterated:

> [29 C.F.R.] Section 825.303(b) makes it clear that merely "calling in 'sick'" is insufficient to trigger any obligation of the employer under the FMLA. *See also Brenneman* [*v. MedCentral Health Sys.*], 366 F.3d [412] at 423 [6th Cir. 2004] (finding that an employee calling in to say that he "wasn't doing well and . . . wouldn't be in today" without indicating that the absence was due to a FMLA-qualifying condition was insufficient on its own to amount to notice under the FMLA).

*Festerman*, 611 F. App'x at 315. Even if the employer knew the employee suffered from a prior health condition, the employee must provide sufficient information from which the employer could conclude that a subsequent absence was related to the previous condition. *Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 556 (6th Cir. 2010) (employee failed to establish requisite notice that absence for headache and elevated blood pressure was FMLA-eligible even though employer knew that employee had undergone triple bypass heart surgery less than two years earlier). "The FMLA does not require an employer to be clairvoyant." *Brenneman*, 366 F.3d at 428. In the absence of evidence relating to causation, it would be unreasonable to require an employer to attribute common illness symptoms such as nausea and vomiting to an FMLA-qualifying condition. *See Reed v. PPG Indus. Ohio, Inc.*, No. 1:18-cv-707, 2018 WL 6078258, at *3 (N.D. Ohio Nov. 21, 2018) (granting summary judgment on FMLA claim based on nausea and vomiting despite plaintiff's testimony that he "frequently suffers from nausea and vomiting before the onset of a urinary tract infection" because plaintiff produced no evidence that defendant knew the nausea and vomiting were related to the FMLA-qualified urinary tract condition).

In the case at bar, Young suffered significant gastrointestinal illness, including nausea and vomiting, on March 12, 2015. (Young Dep., Doc. 30 at PageID 1201.) At a coworker's urging, he reported to INEOS medical services. (*Id.* at PageID 1202.) Although he attributes his illness that day to PTSD, he told Nurse Lawson, "I don't feel so good today." (*Id.* at PageID 1199, 1202.) Nurse Lawson asked if he knew what was making him ill, and he replied, "Stress from my job." (Lawson Dep., Doc. 36 at PageID 1524.) Nurse Lawson did a quick assessment and informed Dr. Schuler that Young was suffering from gastrointestinal issues, and she thought

he should not be working.  (Doc. 37 at PageID 1662–63; Doc. 36 at PageID 1526–27.)  Nurse

Lawson asked Young to talk with Dr. Schuler.  (Doc. 37 at PageID 1663.)

According to Young, he told Dr. Schuler "that he was ill," "that it was stress, and that he

would get this way from stress and that he just needed to go lie down."  (*Id.*)  According to Dr.

Schuler, Young told him:

> Just that he was having conflicts with supervision about – the
> specific thing that I do remember was something about him being
> late to work and he was getting into trouble because he was late for
> work.  And he thought that he could just stay later and do, I think
> what they referred to was flex time, and they weren't letting him do
> that.  And he was upset.  That's the one thing that I remember him
> talking about.  But it was about difficulties he was having with his
> supervisor.

(*Id.* at PageID 1664.)  Young did not recall any other conversations with Nurse Lawson or Dr.

Schuler on March 12, 2015.  (Doc. 30 at PageID 1203.)

On Friday, March 13, 2015, Young remained home sick.  Nurse Lawson telephoned

Young.  Although his wife "did most of the talking," Nurse Lawson insisted on speaking with

Young.  (*Id.* at PageID 1205.)   According to Young, Nurse Lawson asked if he planned to come

to work that day, and Young replied, "I still feel woozy from yesterday, you know, and I'd just

like to stay home today."  (*Id.* at PageID 1204–05.)[9]  Young did not recall anything else about

his conversation with Nurse Lawson on March 13, 2015.  (*Id.* at PageID 1205.)

When Young returned to work on Monday, March 16, 2015, he again spoke with Dr.

Schuler.  He told Dr. Schuler that he felt better by Saturday, and he was ready to return to work.

---

[9] Nurse Lawson recalled that he indicated he was "[f]eeling a little better but not completely up to par."  (Doc. 36 at
PageID 1532.)  Specifically, Nurse Lawson testified, "I think he said something like, I'm feeling better but feel like
I'll be ready to come back Monday."  (*Id.*)  She reminded Young that "if anything changed, [or] he started to feel
worse, he should seek some medical advice," and the conversation ended.  (*Id.*)

(*Id.* at PageID 1207.)  Dr. Schuler may have asked whether Young had a fever, chills, or lightheadedness, but Young does not remember.  (*Id.*)  Based on the information available to them at that time, Dr. Schuler and Nurse Lawson determined that Young's absences on March 12 and 13, 2015, were not covered by the FMLA, and Nurse Lawson emailed that information to INEOS supervisors prior to Young's discharge.  (Doc. 28 at PageID 436; Doc. 28-2 at PageID 510; Doc. 32-1 at PageID 1412; Doc. 37 at PageID 1674–77; Doc. 36 at PageID 1537–39.)

Dr. Schuler became aware that Young suffered from PTSD approximately five or six years before his discharge, but they did not discuss Young's triggers.  Dr. Schuler did not treat Young for PTSD.  (Doc. 30 at PageID 1142–44.)  Prior to March 12, 2015, Young had never reported any gastrointestinal symptoms to Dr. Schuler, and Dr. Schuler did not recall Young missing any work due to PTSD.  (Doc. 37 at PageID 1667; Doc. 32-1 at PageID 1412.)  Dr. Schuler associated PTSD with "anxiety and nightmares and that type of mental anguish."  (Doc. 37 at PageID 1655.)  Although Young told Dr. Schuler his symptoms on March 12, 2015 were caused by stress, Dr. Schuler "thought he meant job-related stress caused by conflicts with his supervisors and not PTSD caused by his military experience."  (Doc. 32-1 at PageID 1412.)  Young admits he never told Nurse Lawson he had PTSD.  (Doc. 30 at PageID 1146.)

Accepting Young's testimony as true and construing all inferences in his favor, the Court is forced to conclude that Young failed to provide sufficient information for his employer to reasonably determine that his absences on March 12 and 13, 2015 were FMLA-qualified. Although Dr. Schuler knew Young had suffered from PTSD for years, Young did not provide enough information on March 12 through 16, 2015 for Dr. Schuler to connect Young's

gastrointestinal problems to PTSD.  Thus, Young cannot invoke the protection of the FMLA for these absences as of March 16, 2015.

2.  *"As Soon as Practicable Under the Circumstances"*

The FMLA recognizes that emergency medical situations arise.  Where timing of the leave is not foreseeable, "an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case."  29 C.F.R. § 825.303(a). "For example, an employer may require employees to call a designated number or a specific individual to request leave.  However, if an employee requires emergency medical treatment, he or she would not be required to follow the call-in procedure until his or her condition is stabilized and he or she has access to, and is able to use, a phone."  29 C.F.R. § 825.303(c).

In the case at bar, Young filed a grievance challenging his termination.  A grievance meeting occurred on April 10, 2015.  At that meeting, Young provided an unsigned, undated FMLA certification from a Veterans' Administration health care provider indicating that Young was diagnosed with PTSD in 2011; that his symptoms include "anxiety leading to nausea/vomiting;" and indicating that his PTSD may cause "episodic flare-ups" based on "environmental stressors."  (Doc. 30-26 at PageID 1348–50.)  Young acknowledges in his response brief that this is the first time "key managerial representatives of INEOS" were exposed to this information and that Dr. Schuler "found this evidence so compelling that he began to reconsider his earlier March 16, 2015 determination that [Mr.] Young may have been suffering from a serious health condition which caused him to become ill on March 12, 2015 and had to go home."  (Doc. 39 at PageID 1794–95.)  As this information provided the requisite FMLA notice (i.e., sufficient information for INEOS to reasonably connect the two-day gastrointestinal illness

16

to Young's PTSD), the issue becomes whether April 10, 2015—nearly one month after Young's March 12 and 13, 2015 illness—constitutes as soon as practicable under the circumstances of this case.

Young spoke with Dr. Schuler and/or Nurse Lawson on March 12, March 13, and March 16, 2015, but did not mention PTSD. However, Young testified that during times of high anxiety, he has "a really hard time of keeping it together" and that impacts his ability to remember and think clearly. (Doc. 30 at PageID 996.) A reasonable juror could conclude that his PTSD-related anxiety attack could constitute an emergency during which Young would not be required to inform INEOS of his FMLA-qualified health issue until his condition stabilized. *See* 29 C.F.R. § 825.303(c). Young offers no evidence, though, that his anxiety attack continued for the period between his March 12, 2015 illness and the April 10, 2015 grievance meeting at which he finally mentioned PTSD.

Accordingly, even permitting Young additional time to allow his PTSD-related anxiety attack to abate, he did not provide notice of an FMLA-qualifying condition as soon as practicable under the circumstances. Thus, his March 12 and March 13, 2015 absences are not covered by the FMLA, and INEOS is entitled to summary judgment on his FMLA interference claim.

## B. Age Discrimination in Employment and Retaliation Claims (Counts Two and Three)

Having determined that Young was not entitled to FMLA protection for his March 2015 absences, the Court must evaluate Young's claims that his employment was terminated due to

age discrimination[10] (Doc. 1 at PageID 5) or in retaliation for filing an EEOC claim[11] on July 23, 2014 (Doc. 1 at PageID 6).  The familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to both age discrimination and retaliation claims. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275 (6th Cir. 2012).  Once a plaintiff establishes a prima facie case of discrimination, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.* at 283 (age), 288 (retaliation).  "If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext."  *Id.* at 283 (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003)).

To establish a prima facie case of age discrimination, a plaintiff must demonstrate: (1) membership in a protected class; (2) qualification for the position at issue; (3) adverse employment action; and (4) either replacement by someone outside of the protected class or other "circumstances that support an inference of discrimination."  *Blizzard*, 698 F.3d at 283 ("circumstances that support an inference of discrimination"); *Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009) ("replaced by someone outside of the protected class").  In this case, the parties agree that Young satisfies the first three criteria.  As to the fourth criteria, INEOS claims it never replaced Young even while admitting that younger electricians have been hired in the years since Young's termination to replace other, retiring electricians.  (Doc. 27 at PageID 261–62.)  Young contends INEOS replaced him with a younger electrician.

---

[10] The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  Plaintiffs may use either direct or circumstantial evidence of age discrimination to establish a claim.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003).

[11] It is unlawful for an employer to discriminate against an employee because that employee opposed any activity prohibited by the ADEA or ADA. 29 U.S.C. § 623(d); 42 U.S.C. § 12203(a).

To establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) protected activity; (2) the defendant was aware of plaintiff's protected activity; (3) adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Blizzard*, 698 F.3d at 288. In this case, INEOS admits that Young engaged in protected activity by filing the grievance and EEOC claim regarding the Utility Operator position. INEOS further admits that Young suffered an adverse employment action. However, the parties disagree as to whether admissible evidence establishes INEOS' awareness of Young's protected activity and whether a causal connection exists between the protected activity and Young's termination.

The Court need not wade into these contested factual matters. Assuming Young can establish prima facie cases of age discrimination and retaliation, INEOS has consistently articulated a legitimate nondiscriminatory reason for Young's termination, i.e., the accumulation of nine attendance points. Therefore, the burden of production shifts back to Young to establish that INEOS' stated reason for his termination is pretextual.

To establish pretext, a plaintiff must offer evidence that:

> "(1) the employer's stated reason had no basis in fact[;] (2) the stated reason did not actually motivate the employer[;] or (3) the stated reason was insufficient to warrant the adverse employment action." . . . Beyond showing that the stated reason for [his] discharge is false, however, [plaintiff] must also produce sufficient evidence from which the fact finder could reasonably infer that the asserted unlawful discrimination or retaliation was the real reason.

*Bailey v. Oakwood Healthcare, Inc.*, 732 F. App'x 360, 362 (6th Cir. 2018) (citations omitted) (quoting *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014)); *see also Gunn v. Senior Serv. of N. Ky.*, 632 F. App'x 839, 844 (6th Cir. 2015) ("[A] reason cannot be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was

the real reason.") (quoting *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012)).

    1. *Stated Reason had No Basis in Fact or Did Not Actually Motivate the Employer*

In the case at bar, Young admits that he was tardy or missed work on the relevant days. Thus, he does not argue that the stated reason—accumulation of nine attendance points—has no basis in fact.

As evidence that the stated reason did not actually motivate the employer, Young points to two statements by INEOS managers. The first of these occurred in approximately 2010, when Tom Pettinger discouraged Young from bidding on the Utility Operator position, saying, "I'd rather you wouldn't bid on that, because you're close to retirement. By the time we got you trained you'd be retired and we'd waste a lot of money getting you trained."[12] (Doc. 30 at PageID 1260–61.) The second comment occurred in the summer of 2014 when Young heard Briscoe say to Stewart, "we got to do something about" Young and referenced "knee problems," "falling all the time," being "late a lot," and having a grievance against INEOS "we don't have a snowball chance in hell of winning." (Doc. 30 at PageID 1025–26.)[13]

Statements that "reflect the 'existence of a discriminatory atmosphere'" in the workplace may "serve as circumstantial evidence of individualized discrimination directed at the plaintiff."

---

[12] Young also contends that Pettinger's 2010 comment constitutes direct evidence of age discrimination, i.e. "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003) (quoting *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999)). However, because Pettinger played no role in Young's termination and because he allegedly made the isolated remark approximately five years before the challenged adverse employment action, the Court concludes that it does not constitute direct evidence of age discrimination.

[13] During the same deposition, Young also recounted Briscoe's comment that day as, "[H]e falls a lot. He's late a lot. And he's got a grievance and we don't have a snow-ass chance in hell of winning." (Doc. 30 at PageID 1186–87.)

*Block v. Meharry Med. Coll.*, 723 F. App'x 273, 281 (6th Cir. 2018) (quoting *Ercegovich v.*

*Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998)); *see Risch v. Royal Oak Police*

*Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) ("[D]iscriminatory remarks, even by a

nondecisionmaker, can serve as probative evidence of pretext.").  As the Sixth Circuit explained:

> In making such an inquiry, however, "the courts must carefully
> evaluate factors affecting the statement's probative value, such as
> 'the declarant's position in the corporate hierarchy, the purpose and
> content of the statement, and the temporal connection between the
> statement and the challenged employment action. . . .'" *Ercegovich*,
> 154 F.3d at 357 (quoting *Ryder v. Westinghouse Elec. Corp.*, 128
> F.3d 128, 133 (3d Cir. 1997), *cert. denied*, 522 U.S. 1116, 118 S.Ct.
> 1052, 140 L.Ed.2d 115 (1998)).  Moreover, "'isolated and
> ambiguous comments are too abstract, in addition to being irrelevant
> and prejudicial, to support a finding' of unlawful discrimination."
> *Parkhurst v. Am. Healthways Servs., LLC*, 700 Fed.Appx. 445, 450
> (6th Cir. 2017) (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020,
> 1025 (6th Cir. 1993)).

*Block*, 723 F. App'x at 281–82.

Pettinger's comment potentially demonstrates an age bias.  However, he did not occupy a

significant place relevant to Young in the corporate hierarchy, and there is no allegation that

Pettinger assessed any attendance points or played any role in Young's termination whatsoever.

In addition, his isolated, single remark was made five years before Young was fired.  Thus, the

Court finds his comment insufficient to raise a genuine factual issue of pretext for age

discrimination.

Briscoe's comment, however, warrants further examination.  Unlike Pettinger, Briscoe

held a management role relative to Young, and Briscoe and Stewart were two of the three

decisionmakers who ultimately terminated Young's employment.  While his statement does not

demonstrate an age bias, referencing the pending grievance requires further evaluation of pretext

for Young's retaliation claim. Briscoe allegedly made this comment in the summer of 2014. (Doc. 30 at PageID 1026.)

In the approximately eight months between Briscoe's comment and Young's termination, many things occurred. First, Stewart announced that the INEOS "no fault" attendance policy would be strictly enforced for all employees in his department. Second, between October 13, 2014 and February 27, 2015, Young admittedly arrived late to work sixteen times resulting in his accumulation of eight attendance points. (Doc. 30-21 at PageID 1342–44.) Third, consistent with the attendance policy, Stewart gave Young written warnings on December 17, 2014, and January 27, 2015, and a "final written" warning indicating it was the "last step prior to discharge" on February 27, 2015. (*Id.*) "[A]n intervening legitimate reason for discipline tends to defeat any inference of retaliation based on the proximity of the discipline to an earlier event." *Bailey*, 732 F. App'x at 368. Fourth, INEOS effectively prevailed on Young's grievance. (Doc. 39-4 at PageID 1819.)

Finally, other than the grievance reference, Briscoe's statement is factually true and can be viewed as an expression of concern for Young's physical wellbeing. Young admits that he had "severe arthritis in both knees" at the time of the statement. (Doc. 30 at PageID 995.) He had fallen "several" times before Briscoe's comment, and he suffered broken ribs in a fall at work during the same timeframe (summer of 2014) as Briscoe's comment. (Doc. 31 at PageID 1359.) Young's issues with punctuality are admitted and well-documented. Accordingly, taken in context, the Court concludes that Briscoe's single, ambiguous comment made approximately eight months before Young's termination is not sufficient to create a genuine issue of material fact that the stated reason for Young's termination did not actually motivate INEOS.

## 2. *Stated Reason was Insufficient to Warrant Adverse Employment Action*

As evidence that the stated reason was insufficient to warrant the adverse employment action, Young alleges he was "arbitrarily and discriminatorily denied" flex time or use of emergency vacation days to avoid accumulating attendance points. (Doc. 39 at PageID 1803–04.) However, he offers no evidence that INEOS "arbitrarily" failed to follow its own procedures in denying Young flex time or use of emergency vacation days. Nor does he identify a single employee who was treated differently than he was treated.

"An employer's failure to follow internal disciplinary protocols is most probative when coupled with evidence that the employer followed the protocols for people outside of plaintiff's protected class." *Gunn*, 632 F. App'x at 847. "Under this method of establishing pretext, plaintiff must demonstrate that other employees outside of [his] protected class were not fired, even though they were similarly situated and engaged in substantially identical conduct to that which the employer contends motivated its decision." *Id.* at 848. "'[C]onclusory and unsupported allegations, rooted in speculation,' are insufficient to create a genuine dispute of material fact." *Id.* at 847 (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003)).

In this case, Young offers no evidence other than his own unsupported allegations that INEOS failed to follow its own policies or "arbitrarily and discriminatorily" denied him flex time or emergency vacation days to avoid attendance points. Similarly, he does not identify a single younger or nondisabled or non-grievance-filing employee who was granted flex or emergency vacation days under any circumstances, let alone circumstances like those in which Young was denied such use. Accordingly, Young has failed to offer evidence sufficient to create a genuine issue of material fact that INEOS' stated reason for his discharge is merely pretext for

discrimination.  Defendant is entitled to summary judgment on Plaintiff's age discrimination and retaliation claims.

### C.  Federal and State Disability Discrimination Claims (Counts One and Five)

In his complaint, Young alleges that his PTSD constitutes a "disability" within the meaning of the ADA, and "INEOS terminated Mr. Young because he was suffering from a disability."  (Doc. 1 at PageID 5.)  His Complaint makes no mention of falling or that INEOS "regarded him as disabled."  Although Young filed his well-written Complaint *pro se*, experienced counsel represented Young as early as April 5, 2017—before INEOS responded to Young's Complaint—yet made no effort to amend Young's *pro se* Complaint at any time during the pendency of this case.  (Doc. 5 at PageID 19.)

In his Corrected Memorandum Contra Defendant's Motion for Summary Judgment, Young raises—for the first time, without citation to a single case, and after discovery has closed—a claim that he was "regarded as" disabled.  (Doc. 39 at PageID 1806–07.)  As evidence in support of this new claim, Young cites only to Briscoe's statement to Stewart that "they had to do something about [Young] . . . [because] he falls a lot.  He's late a lot. And he's got a grievance and we don't have a snow-ass chance in hell of winning."  (*Id.* at PageID 1806 (citing Young Dep., Doc. 30 at PageID 1186, 1215–1216).)

Young testified that he overheard this conversation in the summer of 2014 while he was on light duty with broken ribs he sustained in a fall at work.  (Doc. 30 at PageID 1025–26; Young Dep. Vol. II, Doc. 31 at PageID 1359.)  Young further testified that he had suffered "several" falls at work before this conversation occurred.  (Doc. 31 at PageID 1359.)

The Court concludes that INEOS' Motion for Summary Judgment must be granted as to Young's ADA claim.[14]  First, "[O]ur law is clear: when a plaintiff fails to assert a theory in [his] complaint, [he] may not raise it for the first time in response to the defendants' summary-judgment motion." *Golembiewski v. Logie*, 516 F. App'x 476, 478 (6th Cir. 2013) (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent Bridgeport seeks to expand its claims to assert new theories, it may not do so in response to summary judgment.")); *see also Tucker v. Union of Needletrades, Indus., and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005).  Young did not allege a "regarded as disabled" claim in his Complaint or at any time prior to responding to INEOS' Motion for Summary Judgment.  In addition, his Complaint clearly alleged PTSD as the basis for his ADA claim and state law disability claim.  (Doc. 1 at PageID 5, 7.)  He made no mention of falls as the basis for a disability claim until his summary judgment response, after discovery had closed.

Second, Young acknowledges that he cannot establish a prima facie case of disability discrimination but contends that Briscoe's statement that Young "falls a lot" is "a complete fabrication" and serves as direct evidence of disability discrimination by Briscoe.  (Doc. 39 at PageID 1806–07.)  However, Young admitted that he had suffered "several" falls at work before this conversation and that he was on light duty at the time he overheard the statement due to broken ribs he suffered in a fall at work.  (Doc. 30 at PageID 1025–26; Doc. 31 at PageID 1359.)

---

[14] The Court will analyze Plaintiff's federal and state discrimination claims together.  "Chapter 4112 of the Ohio Revised Code prohibits, among other things, discrimination on the basis of . . . disability.  Because that statute's prohibitions mirror those of the ADA . . ., the state-law claims rise or fall on the resolution of the federal claims." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 848, n.1 (6th Cir. 2018); *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1031, n.1 (6th Cir. 2014).

The ADA provides, in relevant part, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). "Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wright v. Memphis Light, Gas & Water Div.*, 558 F. App'x 548, 553 (6th Cir. 2014) (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.,* 703 F.3d 911, 914 (6th Cir. 2013)). To explain the "vital" distinction between analyzing direct and indirect evidence, the Sixth Circuit recently clarified:

> When an employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision[,] the *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant and the plaintiff has direct evidence of discrimination on the basis of his or her disability.

*Fisher v. Nissan N.A., Inc.*, ___ F.3d ___, No. 18-5847, slip op. at *8 (6th Cir. February 27, 2020) (quoting *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 892 (6th Cir. 2016)) (applying direct evidence test to failure to accommodate disability claim).

In the case at bar, Briscoe's statement that they had to "do something" about Young because he "falls a lot" and "is late a lot," does not constitute direct evidence of disability discrimination. Young's alleged disability is PTSD, which Briscoe neither knew nor mentioned. If Briscoe's comment is direct evidence of anything, it is direct evidence that Young's excessive tardiness was a motivating factor in his discharge. Accordingly, INEOS is entitled to summary judgment on Young's disability claims.

**IV.    CONCLUSION**

For the foregoing reasons, the Defendant's Motion for Summary Judgment (Doc. 33) is

hereby **GRANTED.**  This matter shall be terminated from the Court's docket.

**IT IS SO ORDERED**.

Dated:  <u>March 3, 2020</u>            <u>S/Susan J. Dlott                                    </u>
                                        Judge Susan J. Dlott
                                        United States District Court